UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RJ CAPITAL, S.A.,

                              Plaintiff,

            - against -

LEXINGTON CAPITAL FUNDING III,
LTD., LEXINGTON CAPITAL FUNDING
III, LLC, MERRILL LYNCH
INTERNATIONAL, HARDING
ADVISORY, LLC, and THE BANK OF
NEW YORK TRUST MELLON
COMPANY, NATIONAL ASSOCIATION,

                              Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 30, 2013

**MEMORANDUM
OPINION & ORDER**

10 Civ. 0025 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

            In this action, Plaintiff RJ Capital S.A. alleges that Defendant The Bank of New

York Trust Mellon Company ("BONY") breached its obligations under an indenture agreement

by misapplying certain provisions governing principal and interest payments.  The parties have

filed cross-motions for summary judgment on Plaintiff's claims against BONY for breach of

contract and for a declaratory judgment.  For the reasons stated below, the cross-motions for

summary judgment will be denied.

## BACKGROUND

## I.    INTRODUCTION

            Plaintiff is a holder of Class A-2 Notes (the "Notes") issued by Lexington Capital

Funding III, Ltd. (the "Issuer") and Lexington Capital Funding III, LLC (together with the

Issuer, the "Co-Issuers"). (Pltf. R. 56.1 Stmt. ¶ 1)[1] The Notes are governed by an indenture

agreement dated January 11, 2007 (the "Indenture"). (Def. R. 56.1 Stmt. ¶ 1, Ex. 3 (Indenture))

The signatories to the Indenture are the Co-Issuers and BONY, which agreed to serve as

Indenture Trustee.[2] (Def. R. 56.1 Stmt., Ex. 3 (Indenture)) As Trustee, BONY holds the

collateral securing the Notes in trust, and its duties include serving as "Paying Agent for the

payment of principal and interest on the Notes." (Def. R. 56.1 Stmt., Ex. 3 (Indenture) at § 7.2)

Such duties are "undertaken by the Trustee in its capacity as representative of the Noteholders."

(Def. R. 56.1 Stmt., Ex. 3 (Indenture) at § 6.17) The Indenture also provides for the appointment

of Harding Advisory, LLC as Collateral Manager. (Def. R. 56.1 Stmt. ¶ 3)

      Pursuant to the Indenture, the Issuer entered into swap agreements with Merrill

Lynch International. (Def. R. 56.1 Stmt. ¶ 4) The collateral held by BONY also secured the

Issuer's obligations under the swap agreements, and as detailed below, the Issuer's obligations to

the Noteholders were subordinate to its obligations to Merrill Lynch as the swap counterparty.

(See Def. R. 56.1 Stmt. ¶ 1, Ex. 3 (Indenture) at 1 (Granting Clauses))

      In conjunction with the Indenture, the Co-Issuers prepared an Offering Circular to

distribute to potential investors. (Def. R. 56.1 Resp., Ex. 1 (Offering Circular) at v) The

Offering Circular provides a "summary . . . [of] certain provisions of the Notes and the

Indenture." (Def. R. 56.1 Resp., Ex. 1 (Offering Circular) at 76) "The Trustee [– that is, BONY

---

[1] This Court relies on facts drawn from a party's Local Rule 56.1 statement where the opposing party has admitted those facts or has not controverted them with citations to admissible evidence. See Giannullo v. City of N.Y., 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted."). Where the non-moving party disagrees with the moving party's characterization of the cited evidence, and has presented an evidentiary basis for doing so, the Court relies on the non-moving party's characterization of the evidence. See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion).

[2] Plaintiff played no role in drafting or negotiating the Indenture. (Pltf. R. 56.1 Stmt. ¶ 2)

– did] not participate[] in the preparation of th[e] Offering Circular and assume[d] no responsibility for its contents."  (Def. R. 56.1 Resp., Ex. 1 (Offering Circular) at v)

  The gravamen of the Amended Complaint is that BONY as Trustee, the Lexington entities as Co-Issuers, and Harding as Collateral Manager misapplied certain provisions of the Indenture governing principal and interest payments, to the detriment of Plaintiff.  (Am. Cmplt. ¶¶ 43-56)  The Amended Complaint asserts claims for (1) breach of contract against the Co-Issuers and BONY; (2) breach of fiduciary duty against BONY; (3) tortious interference with contract against Harding; (4) unjust enrichment, diversion, and breach of the implied covenant of good faith and fair dealing against the Co-Issuers, BONY, and Harding; and (5) a declaratory judgment setting forth the appropriate methodology to be used in calculating the principal and interest payments due under the Indenture.  (Am. Cmplt. ¶¶ 65-103)

  In a July 28, 2011 memorandum opinion and order, this Court dismissed all of the claims against Lexington Capital Funding III, LLC and Harding.[3]  RJ Capital, S.A. v. Lexington Capital Funding III, Ltd., No. 10 Civ. 25 (PGG), 2011 WL 3251554, at *2  (S.D.N.Y. July 28, 2011).

  As to BONY, the Court dismissed Plaintiff's claims for breach of fiduciary duty and unjust enrichment, diversion, and breach of the implied covenant of good faith and fair dealing.  Id. at *11-14.  The Court denied BONY's motion to dismiss Plaintiff's claims for breach of contract and a declaratory judgment, however.  Id. at *8-11, *15.  The Court held that (1) certain Indenture provisions governing the disbursement of principal payments were ambiguous; (2) it could not rule as a matter of law that BONY was entitled to immunity under the Indenture, which relieves BONY of liability, under certain circumstances, for actions taken

---

[3]  Plaintiff filed a notice of voluntary dismissal as to Lexington Capital Funding III, Ltd. and Merrill Lynch International on February 23, 2010.  (Dkt. No. 11)

"in good faith";  and (3) a declaratory judgment would "'serve a useful purpose in clarifying and

settling the legal relations in issue,'" given the parties' ongoing dispute about how future

distributions should be calculated under the Indenture.  Id. at *10-11, *15 (quoting Cont'l Cas.

Co. v. Coastal Sav. Bank, 977 F.2d 734, 737 (2d Cir. 1992).  Plaintiff and BONY have now

cross-moved for summary judgment on Plaintiff's remaining claims against BONY.

## II.   INDENTURE PROVISIONS

### A.   Note Valuation Reports

Section 10.7(b) of the Indenture provides that every quarter Lexington Capital

Funding III, Ltd. – the Issuer – must render an accounting, referred to as a "Note Valuation

Report," to the Noteholders and other Indenture participants.  (Def. R. 56.1 Stmt. ¶ 7, Ex. 3

(Indenture) at § 10.7(b))  "Each Note Valuation Report . . . constitute[s] instructions to the

Trustee to withdraw on the related Distribution Date from the Payment Account and pay or

transfer amounts set forth in such report in the manner specified, and in accordance with the

Priority of Payments established in, Section 11.1(a). . . ."  (Def. R. 56.1 Stmt. ¶ 9, Ex. 3

(Indenture) at § 10.7(b))  The Note Valuation Reports set forth, inter alia, an accounting of the

interest and principal payments – the "Interest Proceeds Waterfall" and "Principal Proceeds

Waterfall" payments – to be disbursed to Noteholders "on each Distribution Date."  (Def. R. 56.1

Stmt. ¶ 8, Ex. 3 (Indenture) at §§ 11.1(a)(i)-(ii))  Paul Leba, a Senior Trust Associate at BONY,

drafts the Note Valuation Reports, which are then reviewed by Leba's supervisors and Ernst &

Young.  (Def. R. 56.1 Stmt. ¶¶ 24-27; Shelowitz Decl.,[4] Ex. A (Leba Dep. Tr.) at 20-24)

---

[4]  All citations to the "Shelowitz Decl." refer to the Declaration of Mitchell Shelowitz in Support
of Plaintiff's Motion for Partial Summary Judgment Pursuant to Fed. R. Civ. P. 56(a), dated May
17, 2012 (Dkt. No. 57).

**B.    Interest Proceeds Waterfall and**
**Principal Proceeds Waterfall Payments**

Interest Proceeds are distributed according to an order of priority set forth in

§ 11.1(a)(i) of the Indenture (the "Interest Proceeds Waterfall").  (Def. R. 56.1 Stmt. ¶ 10, Ex. 3

(Indenture) at § 11.1(a)(i))  After interest payments are made, Principal Proceeds are distributed

in a separate order of priority set forth in § 11.1(a)(ii) of the Indenture (the "Principal Proceeds

Waterfall").  (Def. R. 56.1 Stmt. ¶ 14, Ex. 3 (Indenture) at § 11.1(a)(ii))  Under the Principal

Proceeds Waterfall, available Principal Proceeds must first be applied to cover any shortfalls in

the Interest Proceeds Waterfall.  (Def. R. 56.1 Stmt. ¶ 12, Ex. 3 (Indenture) at § 11.1(a)(ii)(1))

Distributions made pursuant to the Interest Proceeds Waterfall and the Principal

Proceeds Waterfall are to be calculated only "after applying funds in the Accounts in accordance

with the Account Payment Priority [provision of the Indenture]."  (Def. R. 56.1 Stmt. ¶¶ 10, 12,

Ex. 3 (Indenture) at §§ 11.1(a)(i)-(ii))  For example, with respect to Principal Proceeds Waterfall

payments, the Indenture provides:

> On each Distribution Date (other than a Redemption Date, the Stated Maturity or
> the Accelerated Maturity Date), after applying funds in the Accounts in
> accordance with the Account Payment Priority, Principal Proceeds, and, to the
> extent described in the Sequential Payment Priority and the Modified Sequential
> Payment Priority, the CDS Reserve Account Excess Withdrawal Amount with
> respect to the related Due Period[,] will be distributed in the order of priority (the
> "Principal Proceeds Waterfall") . . . .

(Def. R. 56.1 Stmt. ¶ 12, Ex. 3 (Indenture) at § 11.1(a)(ii) (emphasis added))  The Interest

Proceeds Waterfall provision contains the same language requiring application of funds in the

Accounts in accordance with the Account Payment Priority provision.  (Def. R. 56.1 Stmt. ¶ 10,

Ex. 3 (Indenture) at § 11.1(a)(i))

The Trustee is responsible for making payments to Noteholders in accordance

with the foregoing procedures.  (Def. R. 56.1 Stmt., Ex. 3 (Indenture) at § 11.1(a))

5

C.      **Account Payment Priority**

The "Account Payment Priority" is addressed in Section 11.1(m), which provides:

> Before requesting a Class A-1 Funding under the Class A-1 Swap to fund a Permitted Use, the Trustee shall apply all funds, securities and other property standing to the credit of the Accounts specified below in the order of seniority specified below in order to pay as and when due and payable each of the obligations of the Issuer listed below (the "Account Payment Priority") . . . .

(Def. R. 56.1 Stmt. ¶ 16, Ex. 3 (Indenture) at § 11.1(m) (emphasis added)).[5]  The Account

Payment Priority provision lists a number of the Issuer's payment obligations that have priority

over payments to Noteholders, and explains from what sources the necessary funds are to be

drawn.  Two of the Issuer's payment obligations set forth in Section 11.1(m) are relevant here:

> [I]n the case of Floating Amounts (other than Interest Shortfall Payment Amounts) and Physical Settlement Amounts payable by the Issuer under Unhedged Long Credit Default Swaps and Swap Termination Payments payable by the Issuer under any Credit Default Swap, the excess, if any, of such amounts that the Issuer is required to pay to the Credit Default Swap Counterparty over any Floating Amounts (other than Interest Shortfall Payment Amounts), Physical Settlement Amounts and Swap Termination Payments that the Credit Default Swap Counterparty is required to pay to the Issuer under the Credit Default Swaps, (i) first, from the Uninvested Proceeds Account, (ii) second, from the Principal Collection Account, and (iii) third, from the CDS Reserve Account[.]

(Def. R. 56.1 Stmt. ¶ 21, Ex. 3 (Indenture) at § 11.1(m)(1) (emphasis in original))

> [I]n the case of any Principal/Writedown Reimbursement or Interest Shortfall Reimbursement Payment payable by the Issuer in respect of Hedging Short Credit Default Swaps that reference Reference Obligations that are not identical to the Reference Obligations of the related Hedged Long Credit Default Swaps, (i) first, from the Principal Collection Account and (ii) second, from the CDS Reserve Account.

(Def. R. 56.1 Stmt., Ex. 3 (Indenture) at § 11.1(m)(4) (emphasis in original))

The Account Payment Priority provision (Section 11.1(m)) also states:  "The

Interest Proceeds [and] Principal Proceeds . . . for any Distribution Date shall be determined after

---

[5] As discussed below and in this Court's earlier opinion (see RJ Capital, S.A., 2011 WL 3251554, at *16), the language given emphasis above creates an ambiguity in the Indenture.

taking into account all of the payments to be made on such Distribution Date in accordance with the Account Payment Priority."  (Def. R. 56.1 Stmt. ¶ 17, Ex. 3 (Indenture) at § 11.1(m))  As Trustee, BONY is responsible for ensuring that Indenture funds are utilized in accordance with these procedures.  (Def. R. 56.1 Stmt. ¶¶ 16-17, Ex. 3 (Indenture) at § 11.1(m))

### D. Swap Agreements and Class A-1 Funding Requests

As noted above, in connection with the Indenture, Lexington Capital Funding III, Ltd. entered into swap agreements with Merrill Lynch.  (Def. R. 56.1 Stmt. ¶ 4)  Under the Indenture, the Issuer may request that Merrill Lynch, as the Class A-1 Counterparty, purchase Class A-1 Notes (a "Class A-1 Funding") in an amount "required in order for the Issuer to pay, as and when due and payable, any Permitted Use for which the Issuer does not otherwise have sufficient funds available in accordance with the Account Payment Priority."  (Def. R. 56.1 Stmt., Ex. 3 (Indenture) at 13, 45, § 17.4(a))  "Permitted Uses" for a Class A-1 Funding include, inter alia, "Floating Amounts and Physical Settlement Amounts in respect of Unhedged Long Credit Default Swaps to the Credit Default Swap Counterparty."[6]  (Def. R. 56.1 Stmt. ¶ 12, Ex. 3 (Indenture) at 51)  The Indenture provides, however, that BONY "shall liquidate any securities or Eligible Investments held in an Account from which payments are to be made in accordance with the Account Payment Priority before the Collateral Manager shall request a Class A-1 Funding."  (Def. R. 56.1 Stmt., Ex. 3 (Indenture) at § 17.4(a))

### III. OFFERING CIRCULAR

The Co-Issuers prepared an Offering Circular summarizing the Indenture (Def. R. 56.1 Resp., Ex. 1 (Offering Circular) at v), and Plaintiff relied in part on the Offering Circular in

---

[6]  Under the Indenture, the terms "Floating Amounts" and "Physical Settlement Amounts" have the same meaning that those terms have in the credit default swap agreements entered into by the Issuer and Merrill Lynch.  (Def. R. 56.1 Stmt., Ex. 3 (Indenture) at 35, 52)

deciding to purchase Notes.  (Cohen Decl.[7] ¶ 21)

The Offering Circular contains a section entitled "Description of the Notes," which quotes portions of the Indenture's Account Payment Priority provision.  (Def. R. 56.1 Resp., Ex. 1 (Offering Circular) at 99)  The Offering Circular's "Description of the Notes" also states:  "The Issuer may not request a Class A-1 Funding if funds available in the Accounts pursuant to the Account Payment Priority are sufficient to make a payment to fund a Permitted Use . . . ."  (Def. R. 56.1 Resp., Ex. 1 (Offering Circular) at 77)

The "Risk Factors" section of the Offering Circular states:

> Payments by the Issuer under the Credit Default Swaps will reduce the amount available to make payments under the Notes and the Preferred Securities.  No payment of interest or principal will be made on the Notes and no distribution on the Preferred Securities will be made unless all amounts due to [the Credit Default Swap Counterparty] under the Credit Default Swaps have been paid in full.  The application of funds to make payments under the Credit Default Swaps pursuant to the Account Payment Priority will reduce the Interest Proceeds and Principal Proceeds available for distribution on any Distribution Date.  In addition, amounts due to the Credit Default Swap Counterparty which have not been paid from funds available in accordance with the Account Payment Priority or from Class A-1 Fundings will be paid under clause (4) of the Interest Proceeds Waterfall or clause (1) of the Principal Proceeds Waterfall before any payment of interest of principal is made on the Notes or any distribution is made on the Preferred Securities.

(Def. R. 56.1 Resp., Ex. 1 (Offering Circular) at 20 (second emphasis added))

> Payments to the Credit Default Swap Counterparty in respect of any Credit Default Swaps . . . will be funded by the Issuer first from the Accounts in accordance with the Account Payment Priority.  As a result, the Issuer may have insufficient funds available to make payments of interest and/or principal, as the case may be, on the Notes when due and payable.

(Def. R. 56.1 Resp., Ex. 1 (Offering Circular) at 48)

> Payments to the Credit Default Swap Counterparty Outside of the Priority of Payments.  Payment of Floating Amounts,[8] Physical Settlement Amounts,[9] Net

---

[7]  All citations to the "Cohen Decl." refer to the Declaration of Jacques Cohen in Support of Motion for Partial Summary Judgment for Plaintiff, dated May 16, 2012 (Dkt. No. 58).

> Issuer Long Fixed Amounts and Swap Termination Payments owed by the Issuer
> will be paid directly to the Credit Default Swap Counterparty in accordance with
> the Account Payment Priority or from Class A-1 Fundings under the Class A-1
> Swap and will not be subject to the Priority of Payments.

(Def. R. 56.1 Resp., Ex. 1 (Offering Circular) at 49 (emphasis in original))

> <u>Adverse Effect of Credit Events and Floating Amount Events.</u>  Payments on the
> Notes and the Preferred Securities will be adversely affected by the occurrence of
> Credit Events[10] or Floating Amount Events[11] under the Synthetic Securities.

(Def. R. 56.1 Resp., Ex. 1 (Offering Circular) at 50 (emphasis in original))

## IV.   PLAINTIFF'S PURCHASE OF THE NOTES AND COMMUNICATIONS WITH BONY PERSONNEL

On April 25, 2008, November 5, 2008, and November 25, 2008, Plaintiff

purchased Notes with a combined face value of $120 million.  (Pltf. R. 56.1 Stmt. ¶ 4)

On July 15, 2008, Jacques Cohen, the principal of RJ Capital (Def. R. 56.1 Stmt.

¶ 71), sent an email to Paul Leba and Annye Hua of BONY stating:

> Assuming we are facing a shortfall in the interest proceeds and there is not
> enough cash to pay the interest to the A, B, and C Notes but there are some
> Principal proceeds which enable the collateral manager to cover the shortfall.  The
> Collateral Manager will allocate some of the principal proceeds to pay the interest
> []as indicated in the waterfall Section 11.1(a)(ii)(1) "to the payment of amounts
> referred to in clauses (1) through (9) of the interest proceeds waterfall in the same
> order of priority . . ."

---

[8]  The Issuer must pay a "Floating Amount" to the Swap Counterparty "upon the occurrence of a Failure to Pay Principal, Writedown or Interest Shortfall under the [Credit Default Swap]."  (Def. R. 56.1 Resp., Ex. 1 (Offering Circular) at 48, 271; <u>see also id.</u> at 251 (defining "Floating Amount Event"))

[9]  "Under the [Credit Default Swap agreement], a Writedown or Failure to Pay Principal . . . will entitle the Credit Default Swap Counterparty, as protection buyer, to elect whether to require the Issuer to pay a Physical Settlement Amount or a Floating Amount under the related [Credit Default Swap]."  (Def. R. 56.1 Resp., Ex. 1 (Offering Circular) at 49, 145, 279)

[10]  "Credit Events" include, <u>inter alia</u>, failures to pay principal and write-downs.  (Def. R. 56.1 Resp., Ex. 1 (Offering Circular) at 146-47)

[11]  A "Floating Amount Event" is defined in the Offering Circular as "a Failure to Pay Principal, Writedown or Interest Shortfall."  (Def. R. 56.1 Resp., Ex. 1 (Offering Circular) at 251)

> I'd like to know if we are facing an event of default in that case.  In other word[s]
> if we have an EOD just because we don't have enough cash to pay the interest[]
> out of the interest proceeds only without taking account [of] the cash in the
> principal proceeds account.  Or if we are facing an EOD ONLY after allocating
> the principal proceeds to pay the interest to the priority Notes A, B, and C and we
> don't have enough cash to cover the shortfall.

(Pltf. R. 56.1 Stmt. ¶ 13; Shelowitz Decl., Ex. A (Leba Dep. Tr.) at Ex. 23 at BNYM00842-43)

(emphasis in original))  Hua responded:  "My understanding is if there are enough principal

proceeds at payment time and can be used to pay the Fee and Accrued Interest, it should not be

consider[ed] a default in the payment, and therefore should not be treated as [an] EOD."  (Pltf. R.

56.1 Stmt. ¶ 14; Shelowitz Decl., Ex. A (Leba Dep. Tr.) at Ex. 23 at BNYM00841)   Leba also

responded:  "I am in agreement that should there be sufficient Principal Proceeds to apply as

interest on the Class A-1 Swap availability of Fee and Notes, there would be no triggering of an

Event of Default."  (Pltf. R. 56.1 Stmt. ¶ 15; Cohen Decl., Ex. M at RJC000252)

## V.    2008 AND EARLY 2009 NOTE VALUATION REPORTS

In all of the Note Valuation Reports issued in connection with distribution

payments in 2008, Leba – BONY's Senior Trust Associate – calculated payments under the

Interest Proceeds and Principal Proceeds Waterfall provisions without applying the Account

Payment Priority provision.  (Pltf. R. 56.1 Stmt. ¶ 18; Cohen Decl., Ex. N (2008 Note Valuation

Reports))  BONY subsequently made distribution payments to Noteholders in accordance with

this approach.  Leba also did not apply the Account Payment Priority provision in preparing the

January 12, 2009 and April 14, 2009 Note Valuation Reports.  (Pltf. R. 56.1 Stmt. ¶¶ 19-20;

Cohen Decl., Ex. O (Original January 2009 and April 2009 Note Valuation Reports))  BONY

made distribution payments to Noteholders in January and April 2009 in accordance with this

approach.  (See Shelowitz Decl., Ex. A (Leba Dep. Tr.) at 50)

## VI.     WRITE-DOWNS AND FLOATING AMOUNT REQUESTS

Beginning in 2008 and continuing into 2009, write-downs occurred which affected the Floating Amount due under the swap agreements.  (Def. R. 56.1 Stmt. ¶ 28, Ex. 2 (Simmons Aff.) at ¶ 14).  Cohen was aware that write-downs were occurring.  (Def. R. 56.1 Stmt. ¶ 71)  In December 2008 and March 2009, Merrill Lynch – the Class A-1 Counterparty – demanded Floating Amount payments in accordance with the swap agreements.  (Def. R. 56.1 Stmt. ¶ 29, Ex. 4)

## VII.    REVISIONS TO THE JANUARY AND
##         APRIL 2009 NOTE VALUATION REPORTS

On June 29, 2009, Paul Leba of BONY sent an email to Brett Kaplan and Jessica Hsieh at Harding stating that the January 2009 distributions to Noteholders had been miscalculated, and that Principal Proceeds allocated to pay Noteholders should, under the Indenture, have been used to address write-downs:

> In light of the recent revisions necessary regarding the Class A-1 Swap and Aggregate Unfunded Balance, we've discovered an additional issue that we need to address.  Regarding the January 2009 payment in which it was the first instance in which Principal Proceeds were allocated to pay the Noteholders (due to insufficient Interest Proceeds), it appears that the funds should have instead been used to pay off writedowns first according to the indenture.

(Def. R. 56.1 Stmt. ¶ 36, Ex. 9)

In July 2009, Leba revised the January 12, 2009 and April 14, 2009 Note Valuation Reports to add a section applying the Account Payment Priority provision to the Principal Payment Waterfall.  (Pltf. R. 56.1 Stmt. ¶¶ 23-24; Cohen Decl., Ex. Q (Revised January 2009 and April 2009 Note Valuation Reports) at BNYM00424-25, BNYM000631-32) Application of the Account Payment Priority provision in the reports reduced the funds available for interest and principal payments to Noteholders.  (Cohen Decl., Ex. Q (Revised January 2009

and April 2009 Note Valuation Reports) at BNYM00425, BNYM000632)  Following the

revisions, the original April 2009 payment made to Plaintiff was cancelled, and BONY withdrew

the funds reflecting this payment from Plaintiff's account.  BONY then deposited into Plaintiff's

account a new payment amounting to $342,348.45 less than the original payment.  (Pltf. R. 56.1

Stmt. ¶ 29; Cohen Decl. ¶ 81, Ex. P (April 2009 Payment Coupons))

## VIII.   SUBSEQUENT REPORTS AND CLASS A-1 FUNDING REQUEST

As of July 6, 2009, insufficient funds were available to satisfy the Issuer's

obligations under the swap agreements.  (Def. R. 56.1 Stmt. ¶ 46)  Accordingly, BONY made a

request for Class A-1 Funding.  (Def. R. 56.1 Stmt. ¶ 47, Ex. 13 (Form of Funding Certificate))

The July 10, 2009 Note Valuation Report did not apply the Account Payment

Priority provision.  (Pltf. R. 56.1 Stmt. ¶ 36; Cohen Decl., Ex. R (July 2009 Note Valuation

Report))  This report was issued before the January and April revised Note Valuation Reports

were issued.  (Def. R. 56.1 Resp. ¶ 36, Ex. 6 (Simmons Supp. Decl.) ¶ 4)

The Note Valuation Reports issued in October 2009 through 2010 applied the

Account Payment Priority provision.  (Pltf. R. 56.1 Stmt. ¶ 37; Cohen Decl., Ex. S)

## DISCUSSION

## I.   LEGAL STANDARD

Summary judgment is warranted when the moving party shows that "there is no

genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law."

Fed. R. Civ.P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes

where the evidence is such that a reasonable jury could decide in the non-movant's favor."

Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citing Guilbert v. Gardner, 480 F.3d

140, 145 (2d Cir. 2007)).  "[W]here the nonmoving party will bear the burden of proof at trial,

Rule 56 permits the moving party to point to an absence of evidence to support an essential

element of the nonmoving party's claim."  Bay v. Times Mirror Magazines, Inc., 936 F.2d 112,

116 (2d Cir. 1991).

              In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities,

and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing

summary judgment.'"  Spinelli v. City of N.Y., 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown

v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)).  However, a "'party may not rely on mere

speculation or conjecture as to the true nature of the facts to overcome a motion for summary

judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a

genuine issue of material fact where none would otherwise exist.'"  Hicks v. Baines, 593 F.3d

159, 166 (2d Cir. 2010) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995))

(alterations in Hicks).

              "The same standard applies where, as here, the parties filed cross-motions for

summary judgment . . . ."  Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001)

(citing Terwilliger v. Terwilliger, 206 F.3d 240, 244 (2d Cir. 2000)).  "[W]hen both parties move

for summary judgment, asserting the absence of any genuine issues of material fact, a court need

not enter judgment for either party.  Rather, each party's motion must be examined on its own

merits, and in each case all reasonable inferences must be drawn against the party whose motion

is under consideration."  Id. (citing Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir.

1993); Schwabenbauer v. Bd. of Educ., 667 F.2d 305, 314 (2d Cir. 1981)).

## II.    BREACH OF CONTRACT CLAIM

### A.    Applicable Law

              "Interpretation of indenture provisions is a matter of basic contract law."  Sharon

Steel Corp. v. Chase Manhattan Bank, 691 F.2d 1039, 1049 (2d Cir. 1982).  The elements of a breach of contract claim under New York law[12] are as follows:  (1) the existence of a contract; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages.  24/7 Records, Inc. v. Sony Music Entm't, Inc., 429 F.3d 39, 42 (2d Cir. 2005). "Here the parties dispute only whether BONY fulfilled its obligations with respect to the disbursement of principal payments under the Indenture."  RJ Capital, 2011 WL 3251554, at *9.

Under New York law, "[i]t is well settled that [a court's] role in interpreting a contract is to ascertain the intention of the parties at the time they entered into the contract." Evans v. Famous Music Corp., 1 N.Y.3d 452, 458 (2004).  Post hoc interpretations of a contract, particularly by individuals who did "not . . . participate[] in drafting or negotiating [the] contract[] . . . are inadmissible and may not be considered on a motion for summary judgment." Faulkner v. Nat'l Geographic Soc'y, 452 F. Supp. 2d 369, 379 (S.D.N.Y. 2006).  "[E]ven if [such] statements were admissible, they constitute only 'unilateral expression[s] of one party's postcontractual subjective understanding of the terms of the agreement and, therefore, . . . [are] not probative as an aid to the interpretation of the contract.'"  Id. (quoting LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 208 n.10 (2d Cir. 2005)).

"Summary judgment is generally proper in a contract dispute only if the language of the contract is wholly unambiguous."  Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 232 F.3d 153, 157 (2d Cir. 2000).

---

[12]  The Indenture provides that it "constitute[s] a security agreement under the laws of the State of New York applicable to agreements made and to be performed therein" (Def. R. 56.1 Stmt., Ex. 3 (Indenture) at 3), and all parties cite to New York law.  Accordingly, the Court will apply New York law here.  See JA Apparel Corp. v. Abboud, 568 F.3d 390, 396 (2d Cir. 2009) (applying New York law on the basis that the "parties agree [that New York law] governs their contract dispute"); Corbett v. Firstline Sec., Inc., 687 F. Supp. 2d 124, 128 (E.D.N.Y. 2009) (applying New York law on the grounds that "both parties cite exclusively to New York contract law in their arguments").

"The question of whether the language of a contract is clear or ambiguous is a question of law to be decided by the court." Id.  "Contract language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement . . . ." Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan, 7 F.3d 1091, 1094 (2d Cir. 1993) (internal quotations omitted).

When contract language is ambiguous, "summary judgment may be granted only if the ambiguities may be resolved through extrinsic evidence that is itself capable of only one interpretation, or where there is no extrinsic evidence that would support a resolution of these ambiguities in favor of the nonmoving party's case." Topps Co., Inc. v. Cadbury Stani S.A.I.C., 526 F.3d 63, 68 (2d Cir. 2008).  In other words, "the court may resolve ambiguity in contractual language as a matter of law if the evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide the contrary."  3Com Corp. v. Banco do Brasil, S.A., 171 F. 3d 739, 746-47 (2d Cir. 1999) (internal quotation omitted).

### B.    The Indenture's Language is Ambiguous

The parties' dispute turns on whether, under the Indenture, BONY properly revised the January 2009 and April 2009 Note Valuation Reports to apply the Account Payment Priority provision of Section 11.1(m), thereby decreasing funds available for the payments to Noteholders under Section 11.1(a)(i) and (a)(ii), despite the fact that a Class A-1 Funding request was not made until July 2009.

As the Court held in denying BONY's motion to dismiss, the Indenture's language is ambiguous on this point.  RJ Capital, 2011 WL 3251554, at *10.  Sections 11.1(a)(i) and (a)(ii) of the Indenture provide that the Interest Proceeds Waterfall and Principal Proceeds Waterfall payments are calculated "after applying funds in the Accounts in accordance with the

Account Payment Priority [provision]."  (Def. R. 56.1 Stmt. ¶ 12, Ex. 3 (Indenture) at §§ 11.1(a)(i)-(ii))  However, the first clause in the Account Payment Priority provision – Section 11.1(m) – references a request for Class A-1 Funding:  "Before requesting a Class A-1 Funding under the Class A-1 Swap to fund a Permitted Use . . . ."  (Def. R. 56.1 Stmt. ¶ 12, Ex. 3 (Indenture) at § 11.1(m))  Based on this language, "the Indenture is ambiguous as to whether the Account Payment Priority is applicable to all distributions, or only when a Class A-1 funding request has been made."  <u>RJ Capital</u>, 2011 WL 3251554, at *10.

Despite the Court's prior ruling, BONY continues to argue that it acted in accordance with the plain language of the Indenture, contending that the "Account Payment Priority is a defined term meaning 'the order of seniority specified' and 'listed' in Section 11.1(m)."  (Def. Br. 14 (emphasis omitted); <u>see also</u> Def. Opp. Br. 5-6, 18-19).  This argument ignores the nature of the parties' dispute.  Both sides agree that the Account Payment Priority provision sets forth a prioritization for payments.  The pertinent question, however, is whether that prioritization is applicable to all distributions, or whether the initial clause of Section 11.1(m) limits the application of that prioritization to payments made in conjunction with a Class A-1 Funding Request.

### C.    The Extrinsic Evidence Does Not Demonstrate that <u>Plaintiff is Entitled to Judgment as a Matter of Law</u>

Plaintiff argues that "a virtual avalanche of evidence supports [its] interpretation that Section 11.1(m) is applicable <u>only</u> immediately prior to a request for a Class A-1 Funding . . . ."  (Pltf. Br. 15)  To the contrary, the extrinsic evidence offered by Plaintiff largely does not support its interpretation of the Indenture.

First, Plaintiff contends that "[f]ollowing Plaintiff's extensive due diligence and very specific communications with BONY officers . . . Plaintiff believed at the time of

purchasing the A-2 Notes that the Account Payment Priority was not applicable to the Priority of

Payments unless a request for Class A-1 Funding was made."  (Pltf. Br. 19-20)  Post-hoc

representations of one party's subjective understanding of ambiguous contract terms does not

provide a basis for granting summary judgment to that party, however.  See Faulkner, 452 F.

Supp. 2d at 379.

     Plaintiff's reliance on the Offering Circular to explain BONY's intent at the time

it entered into the Indenture is likewise misplaced.  The Offering Circular expressly states that

"[t]he Trustee [did] not participate in [its] preparation . . . and assumes no responsibility for its

contents."  (Def. R. 56.1 Resp., Ex. 1 (Offering Circular) at v)  Accordingly, Plaintiff cannot rely

on the Offering Circular to demonstrate BONY's understanding of the Indenture at the time the

Indenture was drafted.

     Even if the Offering Circular could be regarded as probative of BONY's intent, its

provisions do not support Plaintiff's interpretation of the Indenture.  Plaintiff relies on the

portion of the Offering Circular that describes the Account Payment Priority provision (Pltf. Br.

6, 20), but this section merely quotes the Indenture (see Def. R. 56.1 Resp., Ex. 1 (Offering

Circular) at 99), which this Court has found to be ambiguous.

     Moreover, other portions of the Offering Circular undermine Plaintiff's

interpretation of the Indenture.  For example, the Offering Circular states that "[t]he Issuer may

not request a Class A-1 Funding if funds available in the Accounts pursuant to the Account

Payment Priority are sufficient to make a payment to fund a Permitted Use . . . ."  (Def. R. 56.1

Resp., Ex. 1 (Offering Circular) at 77)  This language indicates that application of the Account

Payment Priority provision need not occur simultaneously with a Class A-1 Funding request; if

sufficient funds are available to fund the Permitted Use, no Class A-1 Funding request need be

made.  (See also Def. R. 56.1 Resp., Ex. 1 (Offering Circular) at 20 (stating that payments due to the Swap Counterparty might deplete funds available for payments to Noteholders "on any Distribution Date"))

Indeed, the Offering Circular indicates that application of the Account Payment Priority is triggered by the Issuer's need to make a payment to the Swap Counterparty, not by a Class A-1 Funding request.  For example, the Offering Circular states – without reference to a Class A-1 Funding request – that payments to the Swap Counterparty will be funded "in accordance with the Account Payment Priority," and "[a]s a result, the Issuer may have insufficient funds available to make payments of interest and/or principal . . . on the Notes . . . ." (Def. R. 56.1 Resp., Ex. 1 (Offering Circular) at 48; see also id. at 50 (explaining, without reference to Class A-1 Funding requests, that "[p]ayments on the Notes . . . will be adversely affected by the occurrence of Credit Events or Floating Amount Events"))

The Offering Circular also clarifies that the Account Payment Priority provision – which governs payments to the Swap Counterparty following certain credit events – takes precedence over the Priority of Payments provision – which governs interest and principal payments to Noteholders.  (Def. R. 56.1 Resp., Ex. 1 (Offering Circular) at 49 ("Payment of Floating Amounts [and] Physical Settlement Amounts . . . owed by the Issuer will be paid directly to the Credit Default Swap Counterparty in accordance with the Account Payment Priority or from Class A-1 Fundings under the Class A-1 Swap and will not be subject to the Priority of Payments."))  In sum, the Offering Circular undermines rather than supports Plaintiff's interpretation of the Indenture.

The July 2008 emails cited by Plaintiff likewise do not demonstrate that it is entitled to judgment as a matter of law.  Those emails contain no discussion of the Account

Payment Priority provision.  Instead, in those emails, Cohen inquires about whether an Event of Default would occur if interest payments could be covered only by dipping into the principal proceeds account.  (Pltf. R. 56.1 Stmt. ¶ 13; Shelowitz Decl., Ex. A (Leba Dep. Tr.) at Ex. 23 at BNYM00842-43)  Hua and Leba report that an Event of Default would not occur under those circumstances.  (Pltf. R. 56.1 Stmt. ¶¶ 14-15; Shelowitz Decl., Ex. A (Leba Dep. Tr.) at Ex. 23 at BNYM00841; Cohen Decl., Ex. M at RJC000252)  The Account Payment Priority provision is not mentioned.  Plaintiff infers that Hua and Leba's failure to cite the provision demonstrates that "the Principal Proceeds would not be diverted to the Account Payment Priority in the event that insufficient Interest Proceeds were available to pay interest under the Interest Proceeds Waterfall."  (Ptlf. Br. 8)  No such inference can be drawn from these emails.  Hua and Leba merely acknowledge that if any principal proceeds are available to cover interest payments, they can be used for that purpose.  Cohen did not ask about, and Hua and Leba therefore did not comment on, circumstances that might render principal proceeds unavailable for this purpose.

Plaintiff also argues that its interpretation of the Indenture is supported by BONY's course of performance, noting that BONY did not apply the Account Payment Priority to Note Valuation Reports until the 2009 revisions. (Pltf. Br. 9, 21)  Plaintiff further asserts that, even after BONY implemented its revised interpretation of the Indenture, it did not apply the Account Payment Priority in the July 2009 Note Valuation Report.  (Pltf. Br. 13, 22)  BONY argues, however, that its erroneous failure to apply the Account Payment Priority provision came to its attention only after the July 2009 Report was issued, and that after further analysis, only the January and April 2009 Note Valuation Reports required revisions.  (Def. R. 56.1 Resp. ¶¶ 36; 44)  BONY's course of conduct presents a jury argument, but does not permit the Court to

resolve the intended meaning of the Indenture as a matter of law.[13]

        Plaintiff further contends that "[d]espite Defendant's insistence that the Account Payment Priority must be applied at all times during the life of the Indenture <u>before</u> the occurrence of a Class A-1 Funding request, Defendant has continued to apply the Account Payment Priority <u>after</u> the request for a Class A-1 Funding was made in July 2009." (Pltf. Br. 22 emphasis in original)) This argument misstates BONY's position. BONY contends that the Account Payment Priority provision must be applied to every distribution in which a payment to the Swap Counterparty is implicated. (Def. Opp. Br. 9) Therefore, BONY's application of the Account Payment Priority provision after a Class A-1 Funding Request is entirely consistent with BONY's interpretation of the Indenture.

        In sum, the extrinsic evidence cited by Plaintiff does not demonstrate that it is entitled to judgment as a matter of law.

    **D.**    **The Extrinsic Evidence Does Not Demonstrate that**
           **<u>BONY is Entitled to Judgment as a Matter of Law</u>**

        Under BONY's interpretation of the Indenture, the Account Payment Priority provision must be applied whenever one of the conditions listed in Section 11.1(m) occurs, <u>e.g.</u>, a Floating Amount Event or a Writedown.[14] (Def. Opp. Br. 9) BONY has offered considerable extrinsic evidence to explain how it discovered in the spring of 2009 that it had erred in failing to

---

[13] Plaintiff argues in its reply brief that BONY does not have authority under the Indenture to revise Note Valuation Reports once they are issued. (Pltf. Reply Br. 2-3) This claim is not pleaded in the Amended Complaint and therefore will be disregarded. <u>Scott v. City of N.Y. Dep't of Corr.</u>, 641 F. Supp. 2d 211, 229 (S.D.N.Y. 2009) ("[C]ase law holds that it is inappropriate to consider claims not pleaded in the complaint in opposition to summary judgment.") (internal quotation omitted) (collecting cases), <u>aff'd</u>, 445 F. App'x 389 (2d Cir. 2011).

[14] Contrary to Plaintiff's assertion, BONY does not contend that Section 11.1(m) allows for application of the Account Payment Priority "at any time from the date of the initial offering until a request for Class A-1 Funding is made" (Pltf. Br. 23), but rather only "if payments need to be made due to the conditions in Section 11.1(m)." (Def. Opp. Br. 9)

apply the Account Payment Priority provision to cover write-downs. While this evidence

provides useful context for the revisions made to the January and April 2009 Note Valuation

Reports, it does not elucidate the "intention of the parties at the time they entered into the

contract." Evans, 1 N.Y.3d at 458. The BONY, Harding, and Merrill Lynch employees who

testified on this subject are not alleged to have been involved in the drafting or negotiation of the

Indenture, and their post hoc explanation of their subjective understanding of the Indenture's

terms "may not be considered on a motion for summary judgment." Faulkner, 452 F. Supp. 2d at

379.

        Furthermore, while the Offering Circular tends to support BONY's interpretation

of the Indenture, BONY does not explain how this document sheds light on its intent, given that

the Offering Circular expressly states that BONY had no role in drafting it and assumes no

responsibility for its contents. (Def. R. 56.1 Resp., Ex. 1 (Offering Circular) at v)

        In sum, the extrinsic evidence cited by BONY does not demonstrate that it is

entitled to judgment as a matter of law.

        **E.**        **Immunity for Actions Taken in Good Faith**

        BONY also argues that this action is barred by Section 6.1 of the Indenture, which

provides in part:

> No provision of this Indenture shall be construed to relieve the Trustee from
> liability for its own negligent action, its own negligent failure to act, or its own
> willful misconduct, except that . . .
>
> (ii) the Trustee shall not be liable for any error of judgment made in good faith by
> a Trust Officer, unless it shall be conclusively determined by a court of competent
> jurisdiction that the Trustee was negligent in ascertaining the pertinent facts;
>
> (iii) the Trustee shall not be liable with respect to any action taken or omitted to
> be taken by it in good faith in accordance with the direction of the Issuer or the
> Co–Issuer in accordance with the Indenture and/or a Majority (or such other
> percentage as may be required by the terms hereof) of the Controlling Class (or

> other Class if required or permitted by the terms hereof) relating to the time, method and place of conducting any Proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture . . . .

(Def. R. 56.1 Stmt., Ex. 3 (Indenture) at § 6.1(c) (emphasis in original))

BONY argues that it is entitled to summary judgment because "the actions about which Plaintiff complains were simply actions taken pursuant to the Indenture in good faith and Plaintiff is barred from bringing suit based on such actions." (Def. Br. 19) As the Court stated at the motion to dismiss stage, however (see RJ Capital, 2011 WL 3251554, at *11), whether a party to a contract has acted in good faith generally presents a question of fact for a jury. See, e.g., Int'l Contractors Corp. v. Ill. Union Ins. Co., 79 A.D.3d 1428, 1431 (3d Dep't 2010) ("[F]ailure to [comply with certain terms of an insurance contract] may be excused when the insured has a reasonable good faith belief of nonliability. . . . [This issue] is generally a question of fact for the jury.") (internal citations omitted); see also Greenberg v. Bar Steel Const. Corp., 37 A.D.2d 162, 165 (1st Dep't 1971) (whether a party to a contract performed its obligations in good faith presents a question of fact for the jury); Odell v. City of N.Y., 206 A.D. 68, 85 (1st Dep't 1923) (same).

The record indicates that BONY adopted one interpretation of the Indenture for several distributions and then – after re-analyzing the Indenture in light of concerns raised by Merrill Lynch – reversed course. Even accepting this explanation, the Court cannot rule as a matter of law that BONY has not acted negligently in calculating the payments due to Noteholders under the Indenture. See Ortiz v. Rosner, 817 F. Supp. 348, 350 (S.D.N.Y. 1993) ("Summary judgment is difficult to obtain in negligence actions because whether conduct is 'negligent' is a factual determination in all but the most extreme situations.").

### III.    DECLARATORY JUDGMENT CLAIM

In its Amended Complaint, Plaintiff seeks "a declaration from the Court that the application of the Account Payment Priority of Section 11.1(m) on the January and April 2009 Distribution Dates was improper and that the correct and appropriate methodology that must be utilized when calculating interest and principal proceeds due to the Note Holders is the Priority of Payments formula of Section 11.1(a) of the Indenture." (Am. Cmplt. ¶ 95)  For the reasons stated above, the proper application of the Account Payment Priority provision cannot be determined as a matter of law.  Accordingly, summary judgment on this claim is not appropriate.

### CONCLUSION

The cross-motions for summary judgment are DENIED.  The Clerk of the Court is directed to terminate the motions.  (Dkt. Nos. 56, 67)

The parties are directed to comply with this Court's Individual Rules concerning the preparation of a pre-trial order.  The joint pre-trial order will be filed on April 30, 2013. Motions in limine, voir dire requests, and requests to charge are due on April 30, 2013. Responsive papers, if any, are due on May 14, 2013.  Trial will commence on June 3, 2013, at 9:00 a.m., in Courtroom 705, 40 Foley Square, New York, New York.

Dated: New York, New York
       March 30, 2013

SO ORDERED.

Paul G. Gardephe
United States District Judge

23